IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
VIRGINIA

| | | |
|---|---|---|
| MELVIN MURPHY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | TRIAL BY JURY IS DEMANDED |
| v. | ) | |
| | ) | Case No. 1:13-cv-655-CMH/TRJ |
| CAPELLA EDUCATION COMPANY, | ) | |
| 225 South Sixth Street, 9th Floor | ) | |
| Minneapolis, Minnesota 55402 | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## AMENDED COMPLAINT

COMES NOW the Plaintiff, MELVIN MURPHY ("Mr. Murphy") by counsel, and

moves for judgment against the Defendant, CAPELLA EDUCATION COMPANY ("Capella")

on the grounds and in the amount as hereinafter set forth.

### Parties and Jurisdiction

1.     Plaintiff Mr. Murphy is, and was at all times mentioned herein, a resident of the

Commonwealth of Virginia and Fairfax County.

2.     Defendant Capella, a "for-profit" University, is and was at all times herein

mentioned, incorporated in the State of Minnesota.  It conducts business in the Commonwealth

of Virginia by marketing itself to Virginia residents and offering on-line classes to Virginia

residents, like Mr. Murphy.  It is located in the State of Minnesota and is accredited by the North

Central Association of Colleges and Schools, which currently leases space at Capella's

headquarters office building in Minneapolis, Minnesota.

3.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 and because the parties are of diverse citizenship and the amount in controversy is greater than $75,000.00.

History of Capella

4.      At the time that Mr. Murphy enrolled, Capella had approx. 38,000 students enrolled and grossed approximately $400 million in revenue from those tuition and fees, according to statistics reported by the staff of the Committee on Health, Education, Labor and Pensions ("HELP Committee"), United States Senate.[1]

5.      According to the HELP Committee, about 96% of the students enrolled at Capella were on Federal financial aid and nearly 80% of Capella's total revenue was provided by Federal taxpayers via loans and grants.   Of that revenue, Capella spent 30% (or $100 million) on marketing to prospective students like Mr. Murphy.  Another 20% ($63.9 million) was distributed as profits to its shareholders in 2009.  (Capella's profits increased to $95 million in 2010).  The remaining funds was largely distributed in overhead costs, including an annual salary for its President of $3.8 million – or six times the salary earned by the President of the University of Minnesota.

6.      The explosive student and revenue growth at Capella in 2008 through 2010 was driven by the aggressive recruiting of new students, which led "enrollment counselors" to serve as recruiters who aggressively pushed a potential candidate to enroll in academic programs, such as doctoral programs, regardless of their qualifications, expectations or hopes of obtaining a degree.  (From 2008, the enrollment in Capella increased from 24,000 to over 38,000 students).  The key is the candidate's access to Federal loans.

---

[1]      Senate HELP Committee analysis of U.S. Department of Education, Federal Student Aid Center, *Title IV, Program Volume Reports*, http://federalstudentaid.ed.gov/datacenter/programmatic.html, as reported by the Office of the Inspector General (2010).

7.     Once a student is actually enrolled at Capella and paying tuition, the focus and attention on that student largely disappears.

8.     According to the HELP Committee staff, the average amount spent by Capella in 2009 for instruction was $1,640 per student – compared to $4,538 per student on marketing and $2,912 in profit – or less than 15% of the paid tuition.  By comparison, the University of Minnesota spent $13,247 annually per student on instruction.

9.     More critically, and in contrast to its repeated oral and written representations to Mr. Murphy as described *supra*, Capella had no track record of producing doctoral graduates, either in the "Leadership Ph.D." program in which he enrolled, or in any other academic discipline.  At the time that Mr. Murphy first applied to Capella in 2008, there were purportedly active programs offering Ph.D. degrees.  (Presumably, all these Ph.D. students already held a masters and bachelors degree in order to be eligible).  Yet of those 5,018 students enrolling in 2008, **not a single one had earned a degree through 2010**.  Meanwhile, over 42% of those doctoral students had dropped out, after two years of study, without a degree.

10.     Of the students who enrolled seeking a doctorate in 2008 or 2009, less than 10% would actually receive such a degree.

11.     In summary, Capella is a "diploma mill" – without the diplomas.

<u>Mr. Murphy Learns of Capella</u>

13.     In 2008, after receiving a series of on-line advertisements for Capella University's doctoral programs in business management, Mr. Murphy contacted Capella expressing an interest in their programs.

14.     At that time, Mr. Murphy had a Bachelor of Arts from American University and

3

was pursuing a Master of Business Administration from University of Phoenix.  He was looking

to obtain a Ph.D. for purposes of his professional development.

15.     At that time, Mr. Murphy was the author of numerous published articles and

books in his academic field, which is business management.

16.     Mr. Murphy is also an honorably discharged veteran of the United States Marine

Corps.  He is African-American.

Receipt of False or Deceptive Advertising Materials

17.     In response to Mr. Murphy's initial inquiries, Capella aggressively responded to

Mr. Murphy, calling and emailing him and providing him with brochures and other marketing

materials in an effort to enroll him in its doctoral program.  Those brochures contained materially

false and deceptive information.

**2008 University Guide**

18.     In late 2008, Capella sent Mr. Murphy a 37-page color brochure entitled **"2008**

**University Guide"** which specifically described, among other things, a Ph.D. program in

Organization and Management, with a specialization in Leadership ("Leadership Ph.D.")  It

described the Leadership Ph.D. with the following language:

> **Enhance your ability to manage and lead in today's fast-paced, global**
> **business environment with the Leadership Ph.D. specialization.** The
> curriculum offers a strong foundation in key business functions, along with
> focused leadership courses that allow you to carve your niche in such areas as
> global leadership.  You will also conduct and apply advanced doctoral research to
> the actual challenges facing complex, 21st-century organizations.  People who
> choose this specialization are often pursuing faculty positions or leadership or
> consulting roles in a variety of military, government, business, and nonprofit
> settings. (emphasis added)

19.     The University Guide featured "testimonial" statements by Capella doctoral

4

students, including those studying for the Leadership Ph.D. These testimonials were accompanied by photographs of the quoted individuals, most of whom were African-American like Mr. Murphy and former or current military. The individuals were identified as currently enrolled students in Capella, successful graduates of Capella, or both.

20.     One of these individuals, featured on page 6 of the thirty-seven page brochure, was identified as "Sidney S. Wynn, MS" ("Mr. Wynn").

21.     Mr. Wynn is identified as a Major in the United States Army who lives in Virginia. Based on the photograph, he is African-American.

22.     In the University Guide, Mr. Wynn stated: "I chose the Capella master's degree program as a way to move myself forward and provide an edge when I return to civilian life."

23.     Mr. Wynn's picture and testimonial are accompanied by the following statement - - "Program: PhD in Organization and Management" – which matched the program in which Mr. Murphy wanted to enroll.

24.     Based on the foregoing, it was also reasonable for Mr. Murphy to assume that Mr. Wynn, a fellow veteran and African-American, was:

    a.  a graduate of Capella's masters program

    b.  a current student in its Leadership Ph.D. Program;

    c.  a person who endorsed Capella's academic program.

25.     In fact, at the time the University Guide was sent to Mr. Murphy, Mr. Wynn was no longer a student at Capella, much less pursuing the Leadership Ph.D. program. He never completed his Ph.D. in the Leadership Program. He had never agreed to allow his image,

5

likeness, identity, or statements to be used in Capella's marketing of its Ph.D. degree in this or any other program. The statement attributed to him was fabricated.

26.     At the time Capella sent the University Guide to Mr. Murphy, Capella and its agents had actual knowledge that Mr. Wynn (i) had not been a student at Capella since 2007, (ii) was not pursuing the Leadership Ph.D. or any other field, and (iii) had not given his consent to use his image or statement in Capella's marketing materials. In fact, the statements made by Capella regarding Mr. Wynn were deceptive, dishonestly and openly false.

27.     More pertinently, Capella falsely related in its University Guide that a student like Mr. Murphy could enroll in Capella, take the required classes, and then obtain a Ph.D. in the field of "Leadership:  Organization and Management." That was a false statement, as there was no doctoral degree in that field and Capella had no plans to award one.

### "What Can I Do?" Brochure

28.     In late 2008, in response to Mr. Murphy's interest, Capella's recruiters provided another four-page brochure to Mr. Murphy entitled **"What can I do with a PhD in Organization and Management with a specialization in Leadership?"** The "What Can I do" brochure made additional representations about the Leadership Ph.D, including:

> The Leadership specialization prepares leaders for today's fast-paced and complex global enterprise system . . . . Executives, mid-level managers, and those in the initial stages of their careers are prepared to develop real-world answers to the challenges of the twenty-first century organization.  This specialization prepares doctoral learners to lead, consult, or teach in the area of leadership form an informed, strategic viewpoint, creating practical solutions to real-world problems.

29.     The "What can I do?" brochure went on to list "Common job titles," presumably of graduates of the Leadership Ph.D. program:

"Adjunct or part-time faculty", "Full-time faculty", "Dean or associate dean of a
business program", "Administrator/director", "Leadership consultant", "Business
manager", "Senior business analyst", "Business researcher/writer",
"Organizational consultant", "Executive-level management", and "CEO, CFO,
COO, CLO, president, director."

30.     This list confirms the actual *existence* of graduates who have completed the

Leadership Ph.D. program and found employment.

31.     Like the University Guide, the "What Can I do?" brochure consciously gave the

impression that a Capella student could enroll, take the requisite classes and obtain a Ph.D. in the

Leadership program.  Again, this was a false statement.

32.     In fact, Capella has never awarded a Leadership Ph.D in Organization and

Management and it never will, as the program itself has been discontinued.

<u>False Statements Relied Upon by Mr. Murphy</u>

33.     The false statements in the advertising including but not limited to (i) the

existence of the Leadership Ph.D. degree, (ii) the existence of successful graduates who had

obtained the Leadership Ph.D. degree, and (iii) the existence of satisfied customers like Mr.

Wynn were all repeated and reiterated by Capella "enrollment counselors" whom Mr. Murphy

spoke to in late 2008 and early 2009 in order to obtain more information about Capella and this

specific doctoral track.

34.     The false advertising used by Capella and the false statements made by Capella

regarding its Leadership Ph.D. program (collectively, "the False Statements") were relied upon

by Mr. Murphy to his detriment in applying for the Ph.D. program.

35.     In reliance on the representations about the Leadership Ph.D. as described in the

brochures and in statements by the enrollment counselors, Mr. Murphy applied to Capella in late

2008 and initiated the process of becoming a student for the Leadership Ph.D., with the intent of enrolling and beginning classes in 2009.

Material Omissions Not Disclosed to Mr. Murphy

36.     In applying to Capella, Mr. Murphy stated his express intention of obtaining a Ph.D. in the Leadership Program.  It was his intention to use this degree to teach at the collegiate level, research within that specialty, write additional books, and consult.   In response, it was repeatedly confirmed by the Capella "counselors" prior to his enrollment that the Leadership Ph.D. degree existed,  that he would earn that degree once he had fulfilled the requisite coursework and that the degree would be useful in his chosen profession.

37.     During this recruiting/application phase, and at all relevant times thereafter, Capella failed to disclose to Mr. Murphy, verbally or in writing, the following: [2]

a.   That there was no doctoral degree available in "Organization and Management, with a Specialization in Leadership" and thus no "graduates" of that program;

b.   That students like Mr. Wynn, who were advertised by Capella as satisfied customers, did not actually exist and/or were not enrolled in the represented programs and never made the statements attributed to them;

c.   That a doctoral candidate in any subject must pass the Comprehensive Exams ("or Comps") in order to be eligible for a Ph.D. and most candidates fail these exams;

d.   That the overwhelming majority of doctoral "candidates" at Capella (at least 90%) did not actually obtain their desired degree and that NO candidates in the Leadership Ph.D. program actually obtained that degree in that field.

38.     These material omissions happened, despite frequent contact by telephone, e-mail,

---

[2]     These material omissions are identified as the "Concealed Facts" later in the Complaint.

and correspondence between Mr. Murphy and representatives of Capella, including the Capella "enrollment counselor." Those conversations began in fall 2008 and continued through the spring of 2009, after Mr. Murphy had applied and before he actually enrolled at Capella.

39.     In researching his academic options, Mr. Murphy relied on Capella's assertions as to the details and requirements of the Leadership Ph.D. program under the reasonable assumption that Capella had revealed all material facts pertinent to his potential course of study.

40.     To the extent Capella omitted material facts, details or requirements pertinent to the Leadership Ph.D. program, Mr. Murphy relied on these omissions, as well as the False Statements which had been affirmatively presented to him in 2008.

41.     Capella had actual or constructive knowledge of Mr. Murphy's reliance on its False Statements and on its deliberate omissions as to the Leadership Ph.D. program and its academic offering in general.

<u>Murphy Enrolls in Capella and Takes Classes</u>

42.     On March 5, 2009 Mr. Murphy received an email welcoming him to Capella and assigning him an advisor, Tracy Griffin, for coursework in the Leadership Ph.D. program.  Over the next two years, Mr. Murphy would have over fifty (50) conversations with Ms. Griffin, who became his main point of contact with the institution.   .

43.     On April 6, 2009, Mr. Murphy also received a letter confirming his admission to Capella for the purpose of obtaining the Leadership Ph.D.  Shortly thereafter, his Federal loan information was processed, and he began on-line classes.

44.     For the next three years (2009-2012), Mr. Murphy was a full-time student at Capella, ostensibly studying under the Leadership Ph.D. program

45.     During this time, he took a regular set of classes, which were administered on a quarterly basis. Mr. Murphy was successful in completing the assigned course work, online classes, and other assignments.

46.     In fulfillment of program obligations Mr. Murphy also attended three residency programs known as "colloquia" where he met with other Capella students in a group setting.

47.     During this time, Mr. Murphy consistently paid the average tuition of $4,000 per quarter, as well as the additional costs to attend the colloquia. He financed the tuition and costs through student loans, underwritten by the Federal government. The remaining costs were paid from his own pocket or employee assistance.

48.     Throughout his studies with Capella, Mr. Murphy was in regular contact with his advisors about his progress, course selection, and any difficulties he had understanding course material. His contact consisted of e-mails and telephone calls approximately twice per month.

49.     At no time did anyone associated with Capella, including his "counselors," inform him that his progress was less than satisfactory, that he was unlikely to pass his Comps, or that he would fail to complete the Leadership Ph.D. program for any other reason. Nor did they tell him that the Leadership Ph.D. Program was itself a sham, and that no students received a doctorate in that discipline.

50.     While a student, Mr. Murphy received high marks for his course work, earning a GPA of "3.75" out of a possible 4.0 from Capella, and even earning a $5,000 scholarship towards his tuition. He was selected as a "Capella Ambassador," discussing the school's academic offering with potential and new students. All of these statements and actions had the effect of assuring him that he was succeeding as a doctoral student, and that he should continue

to incur additional tuition obligations.

51.     During this time, he considered himself on schedule to earn his Ph.D in the Leadership Program.  He did not receive any information from Capella or his advisor which indicated that he was not learning the material or was deficient in his learning.  Nor did he receive any information which would have put him on notice regarding the False Facts or material omissions regarding his enrollment.

<u>Mr. Murphy Takes the "Comps" Exam</u>

52.     After successfully completing the prerequisite course work, Mr. Murphy was informed by Capella in August 2011 that he was eligible to take the Comps Exam process as his "course" for the next quarter.  Under the Capella system, the Comps are taken as the last course before the dissertation process and award of a Ph.D.

53.     The Comps is purportedly a written exam which features multiple essay questions in which the doctoral candidate demonstrates knowledge of the subject matter, as well as writing, research, and critical thinking proficiency.  Until passing the Comps, a Capella student is not eligible to write his dissertation or receive the doctoral degree.  If a Capella student fails the Comps twice, he is dis-enrolled.

54.     The Comps is billed as a separate class, which the student takes full time for that quarter.  Like all other quarterly classes, the cost of taking the Comps (at least in the first iteration) is approximately $4,000.

55.     The Course Catalogue for the Leadership Ph.D. program, a document provided to Mr. Murphy after he had enrolled, describes the Comps:

> This course includes an overview of the comprehensive examination process, the university's expectations of academic honesty and integrity, the three core themes

11

of the examination, and the evaluation criteria. The course room mentor provides three questions addressing the core themes. Learners write answers to the comprehensive examination questions. Answers are evaluated by faculty readers using point-scale scoring rubrics. Upon passing the comprehensive examination, learners are eligible to enroll in the first dissertation course.

56.     According to Capella, the Comps work as follows: the doctoral candidate is given a set of essays to be drafted over a twenty-eight day period. Those essays are then graded by two Capella professors who decide whether the candidate passed. If they split their opinion, a third professor is called in to break the tie. During the course of drafting the essays, the candidate is allowed at least one "rewrite" in response to substantive feedback from the professors. However, that process often lengthens the process of taking the Comps, causing the candidate to spend another $4,000 for the next academic quarter.

57.     In reality, the Comps are a sham, which merely serve as a mechanism to complete the fraud perpetrated on students like Mr. Murphy who have enrolled with expectations of a doctoral degree and paid the maximum amount of tuition – and must now be dis-enrolled (without a degree) through an "impartial" system which provides a plausible explanation for this disastrous outcome.

<u>Capella Fails Mr. Murphy on First Set of Comps</u>

58.

59.     Mr. Murphy started working on his Comps in the fall of 2011. As the author of several books and multiple published articles, he expected to pass the writing skills portion.

60.     Upon turning in drafts of his answers to the Comps to the supervising facilitator, Mr. Murphy received criticism of his writing style which was arbitrary and pretextual. As a result, he was forced to exercise his "rewrite" option on the Comps, which he did.

61.     In December 2011, Capella informed Mr. Murphy that he had failed his first round of the Comps.  He was given the opportunity to take a remedial called an "Intervention writing class" which would cost him additional tuition of $4,000.00.  Without taking this remedial course, Mr. Murphy would not be eligible to take the Comps again, and would be disenrolled from the program without any refund – a loss of over $70,000 in invested educational funds at that time.

62.     Because he had no other choice, Mr. Murphy subsequently paid for and took the remedial writing course and lab in the spring of 2012.  He received an "A" letter grade for that writing class and a "S" for Satisfactory in the lab.

63.     In the summer of 2012, Mr. Murphy again began the twenty-eight day process of taking the Comps.  As part of that process, Mr. Murphy had to pay another $4,000 quarterly tuition in order to participate (again) in taking the Comps.

64.     In taking the Comps a second time, Mr. Murphy's writing was again subject to technical and arbitrary criticism, which had no relation to the subject matter.

65.     Specifically, Mr. Murphy's initial Comps essay in summer 2012 was flagged for "plagiarism," apparently because he failed to enclose a direct quote in quotation marks.  This was despite the fact that Mr. Murphy's essay clearly indicated the statement as being by another writer, complete with citation information.

66.     As a result of the technical default, Mr. Murphy's essay was returned to him without any substantive feedback and his 14-day rewrite period was triggered without any substantive feedback.

67.     After resubmitting the Comps a second time in fall 2012, Mr. Murphy was

13

informed by Capella that he had failed again.

### Capella Drops Mr. Murphy as Student

68.     Following an appeal of his second arbitrary "failure" on the Comps, Mr. Murphy was informed by Capella that he could take the Comps a third time if he re-enrolled in the Comps course, at an additional cost of $4,000. If he did not elect this option, Capella informed him that he would be automatically disenrolled from the doctoral program. Notably, this disenrollment occurred after Mr. Murphy had already spent over $70,000 in tuition.

69.     Mr. Murphy elected not to pay an additional $4,000 for what experience had shown him to be a fruitless endeavor. He asked Capella about his options.

70.     In response to Mr. Murphy's inquiry, Capella told him that he would be eligible for getting a Masters degree based on his completed coursework, but only if he paid another $4,000 towards a course called "Contemporary Leadership Opportunities Capstone." This offer was meaningless to Mr. Murphy as he already held a Masters degree.

71.     Mr. Murphy never received a degree from Capella.

### Mr. Murphy Investigates Capella
### And Learns the Concealed Facts and False Facts

72.     Following his disenrollment from Capella in late 2012, Mr. Murphy has contacted over fifty other Capella students, primarily through the *colloquia* and other Capella connections. Most of these were students pursuing a doctoral degree in the same program: "Organization and Management, with a focus in Leadership."

73.     Each person contacted by Mr. Murphy stated the exact same process:

    a.  Receiving enrollment brochures with persons, especially minorities, who were
        falsely portrayed as "successful" students (or graduates) of the Leadership Ph.D.

14

program, or a similar doctoral program;

b. Enrollment in a doctoral program without knowledge of its the Comps requirement or the overall low rate of passage;

c. Taking classes and receiving a high GPA, without any indication or warning of deficiency in the subject matter;

d. Taking the Comps, after passing all the requisite classes and paying out the maximum tuition;

e. Failing the Comps based upon arbitrary and subjective reasons unrelated to the substance of the subject;

f. Having to take remedial classes and/or retake the Comps, so as requiring the payment of more quarterly tuition;

g. Being dis-enrolled from the program without receiving a Ph.D. and after having paid at least $60,000 (or more) in wasted tuition.

74.     Based upon his investigation, Mr. Murphy has learned the following material, and heretofore concealed, facts ("Concealed Facts") regarding the Capella process for enrolling doctoral candidates and awarding doctoral degrees:

a. That Capella awards a miniscule number of doctoral degrees (less than 10% of enrolled candidates) – and it awards no Ph.D. degrees in the fraudulent "Leadership Ph.D. program;"[3]

b. That Capella makes no effort to weed out unsuccessful candidates – or candidates in nonexistent programs -- until they have paid the maximum possible tuition, e.g.

---

[3]     In his investigation, Mr. Murphy has not contacted a single student in the Leadership Ph.D. program that actually obtained a Ph.D.

through at least 12 academic quarters;

c.  That Capella administers the Comps exam in such a manner as to maximize its financial yield, i.e. by requiring every candidate to use at least a "second" quarter to complete the Comps.

d.  That Capella uses the Comps exam to systematically dismiss doctoral candidates who have otherwise completed the course work;

e.  That Capella invests less than 15

f.  % of the students' tuition funds in academic instruction and does not prepare their students to pass the Comps successfully (assuming that is even possible) or obtain a doctoral degree;

g.  That Capella uses false advertising, with examples like Mr. Wynn, in order to promote their product especially to minority candidates.

75.  All the Concealed Facts were known to Capella, beginning in 2008 when Mr. Murphy first contacted Capella and continuing through December 2012 when he was dis-enrolled. At no time did Capella disclose these facts to Mr. Murphy, who labored in blissful ignorance of this entire scheme. The Concealed Facts worked in tandem with the False Facts, which consisted of the false statements made by Capella in 2008-2009, prior to Mr. Murphy's enrollment, regarding (i) the existence of the "Leadership Ph.D. program," (ii) the future employment prospects of its "graduates," and (iii) the successful stories of its "alumni" – including the mythical Mr. Wynn.

76.  The Concealed Facts and the False Facts were material in that the disclosure of any of these facts – or the revelation of truth for the False Facts -- would have conclusively

16

dissuaded Mr. Murphy's enrollment at Capella.

77.     In reliance on the fact that Capella had a legitimate Ph.D. program in his chosen field and <u>without</u> knowledge of any of the Concealed Facts or False Facts, Mr. Murphy paid over $70,000 in tuition over the course of three years, while also dedicating himself to a significant – and ultimately futile -- amount of time for study and course work towards his degree.

78.     Mr. Murphy's reliance was reasonable on the details and requirements of the Leadership Ph.D Program as revealed to him prior to his enrollment.  He had no reason to learn about the False Facts or the Concealed Facts, until the time of his disenrollment in 2012 and did not discover them until that date.

79.     Capella intended for Mr. Murphy to rely on its assertions of the False Facts in 2008, which it kept concealed, and further intended that he base his enrollment in Capella and ongoing tuition payments on the absence of any knowledge of the Concealed Facts.

80.     Had Mr. Murphy been aware of the False Facts or the Concealed Facts, he would never have enrolled at Capella and invested such an extraordinary amount of time and money in an ultimately wasted endeavor.

81.     The actions of Capella in misrepresenting the False Facts, omitting the Concealed Facts and using the Comps as a pretext to punitively dis-enroll students (after they spend all their available funds) have proximately caused damage to Mr. Murphy.

82.     The actions by Capella are willful and wanton.  In the alternative, they were taken with a conscious disregard for the rights of Mr. Murphy.

## COUNT I –
## VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT

83.     Mr. Murphy repeats and alleges each and every allegation contained in

17

Paragraphs 1 through 82 of this Complaint as if fully set forth herein.

84.     Defendant Capella is a supplier and Mr. Murphy is a consumer in a transaction regulated by the Virginia Consumer Protection Act, Va. Code § 59.1-196.

85.     Defendant Capella violated Va. Code § 59.1-200(A)(5) by misrepresenting the characteristics and benefits of their educational services. To wit, Capella has misrepresented the False Facts, including but not limited to (i) the existence of the Leadership Ph.D. degree, (ii) the existence of "graduates" of the Leadership Ph.D. program who actually held doctoral degrees in that field, and (iii) the existence of persons, like Mr. Wynn, who were satisfied customers in this field.

86.     Defendant Capella also violated Va. Code § 59.1-200(A)(5) by fraudulently omitting and concealing from Mr. Murphy the Concealed Facts, which are

a.  That Capella awards a miniscule number of doctoral degrees (less than 10% of enrolled candidates) – and its awards no Ph.D. degrees in the fictional "Leadership Ph.D. program;"

b.  That Capella makes no effort to weed out unsuccessful candidates – or candidates in nonexistent programs -- until they have paid the maximum possible tuition, e.g. through at least 12 academic quarters;

c.  That Capella administers the Comps exam in such a manner as to maximize its financial yield, i.e. by requiring every candidate to use at least a "second" quarter to complete the Comps.

d.  That Capella uses the Comps exam to systematically dismiss doctoral candidates who have otherwise completed the course work;

18

e.  That Capella invests less than 15% of the students' tuition funds in academic

instruction and does not prepare their students to pass the Comps successfully

(assuming that is even possible) or obtain a doctoral degree;

f.  That Capella uses false advertising, with examples like Mr. Wynn, in order to

promote their product especially to minority candidates.

87.  The False Facts and Concealed Facts all related to matters of existing material

facts, at the time they were made in late 2008 and early 2009.  Mr. Murphy did not discover the

truth relating to these False Facts until after he was dismissed from Capella in 2012.

88.  Capella knew that Mr. Murphy would rely on the facts they presented to him in

enrolling at Capella and investing over $70,000 in tuition. Yet they still presented him with false

information and withheld critical facts that would have painted an accurate picture of his

purported educational investment.

89.  Defendant Capella violated Va. Code § 59.1-200(A)(8) by not providing the

advertised services as advertised and for the price and terms advertised.  As stated *infra*, Capella

advertised a purported doctoral program in "Organization and Leadership, with a Specialization

in Leadership" and then provided a different, undisclosed program with significant additional

time and costs – included the taking of the Comps and taking remedial writing classes in order to

avoid disenrollment -- without any possibility of obtaining a degree.

90.  Defendant Capella violated Va. Code § 59.1-200(A)(13) by attempting to enforce

an unlawful penalty clause.  To wit, Capella arbitrarily "failed" Mr. Murphy and then charged

him additional "penalties" for remedial courses, as well as requiring him to take the Comps over

again in a vicious cycle of continuous expenditures.

91.     Defendant Capella violated Va. Code § 59.1-200(A)(14) by using deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction. As state *infra*, Capella failed to give Mr. Murphy material information regarding the Concealed Facts, all of which were pertinent to his educational experience. It also used false statements in its advertising and planted false testimonials which were directly relevant to Mr. Murphy and his own educational goals. These false statements included all references to Mr. Wynn and other bogus "candidates," as well as advertising "careers" arising from a Leadership Ph.D. which did not exist.

92.     Mr. Murphy relied on all the above misrepresentations and material omissions, which were continuing in nature, in enrolling at Capella and paying its tuition through 2012. As a result, Mr. Murphy was proximately damaged by the actions of the Capella, which caused him to enroll in its program and spend over $70,000 on tuition.

93.     Defendant Capella's violations were willful and intentional. They are not as a result of any *bona fide* error.

COUNT II—FRAUD

94.     Mr. Murphy repeats and alleges each and every allegation contained in Paragraphs 1 through 93 of this Complaint as if fully set forth herein.

95.     Capella made several misrepresentations to Mr. Murphy, or omitted to disclose certain material existing facts in connection with Mr. Murphy's enrollment and studies at Capella, including but not limited to:

      a.     Falsely representing the existence of its Leadership Ph.D., which it heavily advertised to Mr. Murphy, and the employment prospects of persons "graduating" from that program;

20

b.    Falsely representing that Mr. Wynn and others were "students" in the
      Leadership Ph.D. program and were satisfied with the program, when they
      were neither;

c.    Intentionally concealing the fact that few, if any, students at Capella
      actually earn a doctoral degree;

d.    Intentionally concealing the requirement that students in its Ph.D.
      programs are required to pass the Comps, which are designed to fail
      students only after requiring them to spend additional funds on "remedial"
      courses and "re-writes" of the Comps;

e.    Intentionally concealing the fact that Capella uses the Comps to disenroll
      those graduate students who have successfully completed their classes and
      should be approaching dissertation;

f.    Intentionally concealing the fact that Capella uses less than 15% of its
      funding on academic instruction and that the majority of its revenue,
      arising from tuition funds from students like Mr. Murphy, is spent on
      "recruiting" and "profit" for Capella.

96.   These representations and omissions were material to Mr. Murphy's decision to
enroll in the Leadership Ph.D. program at Capella.

97.   At the time Capella made the misrepresentations described in this Count, Capella
knew Mr. Murphy was relying on its misrepresentations and omissions.

98.   Mr. Murphy reasonably relied to his detriment on Capella's representations and
omissions, which were continuing in nature.   He was damaged as a result of Capella's

fraudulent misrepresentations by paying or incurring more than $70,000 in student loans for a degree Capella knew he would not earn, as well as loss of his time and effort spent pursuing an ephemeral academic credential Capella had no intention of ever bestowing on him, regardless of the quality of his work.

99.    Capella's intentional misrepresentations were willful, malicious and in reckless disregard of Mr. Murphy's rights and interests, sufficient to award punitive damages.

<u>COUNT III—</u>
<u>CONSTRUCTIVE FRAUD</u>

100.    Mr. Murphy repeats and alleges each and every allegation contained in Paragraphs 1 through 99 of this Complaint as if fully set forth herein.

101.    Capella made several misrepresentations to Mr. Murphy, or omitted to disclose certain facts in connection with Mr. Murphy's enrollment at Capella, which have been fully articulated herein.

102.    These representations were material to Mr. Murphy's decision to enroll in the Ph.D. program in Organization and Management with a specialization in Leadership.

103.    At the time Capella made the misrepresentations described in this Count, Capella knew or should have known that Mr. Murphy was relying on its misrepresentations and omissions regarding its program.

104.    Mr. Murphy reasonably relied on Capella's representations, which were continuing in nature.  He was damaged as a result of Capella's fraudulent misrepresentations by paying or incurring more than $70,000 in student loans for a degree Capella knew he would not earn, as well as infliction of emotional and psychological distress, loss of convenience, and loss of his own time spent pursuing an ephemeral academic credential Capella had no intention of

ever bestowing on him, regardless of the quality of his work.

105.    In the alternative to Capella's representations having been made knowingly or intentionally, these statements or omissions were made negligently so as to allow for a claim of constructive fraud.

PRAYER FOR RELIEF

WHEREFORE, Mr. Murphy prays that this Court:

1.    Award compensatory damages in the amount of $150,000.00, which amount shall be trebled under § 59.1-204;

2.    Award statutory damages as available under § 59.1-204, et seq.;

3.    Award punitive damages no less than $350,000;

4.    Award Mr. Murphy's costs and reasonable attorneys' fees;

5.    Award prejudgment interest, costs and such other relief as the Court deems appropriate.

MELVIN MURPHY

By: _____
                        Counsel

J. Chapman Petersen, Esq., VSB #37225
Jason F. Zellman, Esq., VSB #77499
SUROVELL ISAACS PETERSEN & LEVY PLC
4010 University Drive, 2nd Floor
Fairfax, VA 22030
Telephone 703-277-9704
Facsimile 703-591-9285
Counsel for Mr. Murphy